The next matter is number 221830. M.L. v. Concord School District at all. At this time, would counsel for the appellant please introduce himself on the record to begin? Yes, sir. My name is Jim Davey. I represent M.L. I'd like to reserve three minutes for rebuttal, please. You may. Thank you. Your Honors, may it please the Court. This case involves a number of hotly disputed facts on an already fact-intensive legal question. Here, the District Court erred because it failed to construe key facts in favor of M.L. on the summary judgment posture, an error appellees invite this Court to make as well. The summary judgment record contains substantial evidence that the school district bent over backwards to avoid finding that a sexual assault had occurred and failed to protect M.L.'s equal access to educational benefits. Accordingly, a reasonable jury could conclude that Concord acted with deliberate indifference. This Court should reverse for a jury to resolve the fact disputes that pervade this case. There are several independent bases upon which a jury could find deliberate indifference. I'm happy to start with any of them if you all have a preference. I know there are obviously facts in dispute, and I'll give you just an example. The issue with the bus driver, she stated how the incident had happened or how, let me get the name, L.M. because I get mixed up, had sort of threatened her, and then somebody else concluded it was otherwise from the video, matters like that, but I think what is important here in the Title IX context, did the school district take reasonable efforts? And I think that's what the focus should be because, again, there's, you know, probably 15 witnesses, and nobody's going to have this, you know, there's going to be discrepancies, but the thing is, are there reasonable efforts? And I think that's how we have to look at the case from that perspective and how Judge Barbara Doran looked at the case. I agree, Your Honor, and just to be sort of responsive to that, under the Title IX standard, that is exactly right. The jury has to be able to find that the school district acted in a clearly unreasonable way. I agree. Because if there's two different statements and the district evaluates those statements and concludes this is what happened, it doesn't mean it's not being reasonable. It might be the wrong result. It might be, you know, but, again, it doesn't mean it's not reasonable. Here, so I want to split this up. So what makes it unreasonable? Yes, and I want to split this up. And what are the genuine issues of material fact that make it unreasonable? Certainly, and I want to split this up a little bit. In response to sort of what you seem to be talking about, about the initial decision, the thing that a jury could find as clearly unreasonable is that she says, L.M. assaulted me. L.M. says, hey, school resource officer, I'd like to speak to you man-to-man. I know I did something wrong. And then the bus driver says, yeah, I saw her walking stiffly, rigidly, as if she was assaulted. And then the school says, we have no idea what happened. We can't possibly, you know, we can't possibly figure that out. We're not going to open an investigation. And it was further unreasonable for them to decline to open the formal investigation, and that's a JA-124 and 130. They say because there's no evidence, first of all, the confession is evidence, and second of all, that's what the investigation is for. And so I think that's clearly unreasonable. At what point did the no contact orders come in? And I'm going to, and that's the second thing that I was going to say, which is that, Judge Helpe, I think you were talking about the initial, you know, determination about what happened. There's multiple independent bases upon which a jury could find that the school had acted clearly and reasonably. I think the best example, actually, is maybe not the initial decision, but the way that they handled everything subsequently. The no contact order was entered, I want to say, on December 11th. And LM proceeded to repeatedly and frequently violate it, as the school superintendent's notes acknowledge, and that's at JA-291. And basically, between September 11th and March, I want to say March 2nd, or March 6th, they have repeated contacts from ML's family saying he's harassing her over text message, his friends are harassing her over text message, he's popping up in the halls where he's not supposed to be, she's not able to eat lunch in the cafeteria, she's- So you're suggesting that LM is given, like, he violates, violates, whatever, and he's given another break, another break, another break, is that correct? Yes, exactly, exactly. And I think if you look at this court's decision in Willis, you know, Willis talks about if you do something initially, and Judge Monte Carlo, I think the no contact order is the thing that they did, it was too late. He was able to harass her even before that entered. But even let's say you just take that. In the intervening more than two months, he's harassing her, harassing her, harassing her, and the school district doesn't do anything. And Willis says that if you take some action, and it proves to be ineffective, you have to do something else. And the school district didn't do anything else in those intervening two months, which obviously allowed, or to put it in the Title IX formulation, made her more liable to further harassment. And obviously she wasn't just made more liable to it. She suffered additional harassment. And so, again, just to sort of come back to the overarching thing here, there's four different sort of arguments for ways that the school district was clear and reasonable. One of them was, again, that initial decision that Judge Healthy, you and I were just talking about. The second one is they acted unreasonably when they finally did act, and we can talk about that if you want. But the third one is that, again, what we're talking about now with Willis, if you know that your actions are not effective, a school district is required to take different actions, or they're required to do something else that might be effective. The fourth reason, I think, is the unreasonableness of the sort of reinvestigation. But, again, I think these are all independent bases. We can win on any of them. I think that the Willis one is. Let's assume the reinvestigation, and, again, this is just for the sake of argument. Yeah. Let's assume the results were correct. Would you still have a case based on those two months before or whatever period before the reinvestigation when nothing was being done and the allegations were there? So I want to say two things about that. The first is that on the summary judgment posture, I don't think you could assume that the reinvestigation was correct. I think that's one of the sort of errors that the district court made. However, even if you assume that, let's take the hypothetical, of course you would still have a claim for the ensuing two months. It's sort of a straightforward Willis claim under this court's precedent. The two months of, you know, they institute a no-contact order. The no-contact order doesn't work, and they do nothing for two months. And what are you suggesting should have been done? Perhaps suspend the student. I know he was suspended from taking the bus for ten days. I think that's the only. Yes. And then there was the order. But are you suggesting maybe suspend him or make him go to another school or take some other action? Yeah, I mean, I want to be, just to be very clear, under Title IX, and, you know, David says this, the family, a family or a student is not allowed to dictate what does happen. And so I wouldn't, I certainly wouldn't. Well, you can't dictate, but. I can't dictate. The answer is. In the realm of possibilities, perhaps. The answer is anything. Yeah, the answer is. We're taking all these other. The answer is anything. The answer is if you know that the student who is subject to a no-contact order is repeatedly violating it. Something other than saying to that student, hey, remember, you have a no-contact order, as he continues to violate that no-contact order. And, again, I don't know whether that's a suspension. I don't know whether it's counseling. I don't know whether it's. Well, what you're suggesting is that the issue of reasonable efforts, based on the evidentiary record, should go to the jury. Yeah, absolutely. It's up to the jury. And, again, the jury could say reasonable efforts, you have no case, or it could say yes. I think that's right, Your Honor. But that's not really the standard. I mean, isn't this the. . . You know, we're told in the case we can't hold the school to sort of heroic efforts. Certainly. And a lot of what we're talking about today is what the school maybe should have done better, what they could have done better. But the fact of the matter is they did take actions, and our standard is deliberate indifference. So if you really narrowed in on your argument, where is the deliberate indifference, given the circumstances? Yeah. Again, the deliberate indifference is doing nothing. Again, on this particular basis that we're talking about, the answer is doing nothing between entering the initial no-contact order and more than about two months later. But I guess they did enter a no-contact order, right? Yes. They didn't show complete indifference to the circumstances that were brought to them. So is the no-contact order actually maybe a problem for you? The no-contact order is not a problem because, again, whether you look at this court's decision in Willis, whether you look at Porto, this court's decision in Porto, which underscores that. And other circuits are very clear about this too, whether you look at feminist majority in the Fourth Circuit, whether you look at school district number one in the Tenth Circuit, whether you look at Waymer in the Sixth Circuit, which I actually think has the best articulation of why this is a problem, right? Of course a school might do something, and in this case that maybe is the no-contact order, if it proves to be ineffective. Again, here, as it immediately did, they have to do something else. Zeno in the Second Circuit is the same thing. Schools are not, you know, deliberate indifference is a higher standard than negligence, but you can't say, oh, we did one thing and then didn't change course and it proved ineffective. That, you know, this court and every other court to have looked at that question. I'm struggling with the notion of how it proved ineffective. First of all, we had more here than the no-contact order. We also had the designated seating arrangement on the bus. Yes. Is that correct? Yes, Your Honor. And then when there was a problem with the no-contact order, at least insofar as it involved the math class, there was an effort made to ensure that that type of contact did not occur thereafter. Well, Your Honor, so first, I guess I have two answers to that. The first is that there are other violations of the no-contact order, which included text messaging, included him texting her friends to say that it was a worrying time and that he wanted to ruin her life, including his friends texting her, including his father eventually coming and staring her down at school. How is his friends texting her? So in the no-contact order that they issued, which is in the JA, it specifically says you are not allowed to harass her by proxy. So that's, I don't think, in the school, I don't think that's true. But what evidence is there that he was responsible for his friends texting her? Or did that also? Well, just to be clear. A young person may take an action which is improper, and his friends may come to his defense for one of two reasons, either because he solicits their help or because they spontaneously take his side. And I don't see anything in the record, maybe I've missed it, that he solicited his friends or somehow instigated those text messages from them. I just wonder how that becomes conduct attributable to him. I think on a summary judgment posture where you're construing all facts in favor of ML as required by the law. But there has to be a fact to construe. There has to be some evidence that he instigated those messages or at least condoned them. I don't see any evidence at all as to his relationship to his friends' messages. Certainly, Your Honor. I mean, I think that if you were, you know, LM's girlfriend was one of the people engaging in this. Sorry, is it fine for me to finish? Finish this question, then you still have three rebuttals. Certainly. Just to be very clear, I think that if you look at the fact that his girlfriend was one of the people that was texting and was texting information that she could only know from him, I think it's fair to infer that that information ultimately traces back to him, right? And when she says, oh, you know, ML is going to be suing LM. First of all, that wasn't even true. But second of all, that could only have come from LM himself. And so I think that's a fair inference to draw on the posture. And just to, you know, to answer your overarching question here about, again, this other evidence of the sort of violations of the no contact order, you mentioned the math class thing. You know, the district didn't even tell the math teacher who had them in back-to-back periods that there was a no contact order. And so I think it was, I mean, that gets to one of the other arguments that the district set it up to fail. But the fact that they encountered each other in between math class regularly, the fact that he was texting her, the fact that his friends were texting her, the fact that, you know, you mentioned the sort of the bus suspension. She, there's evidence in the record that she stopped riding the bus entirely. And, you know, there are multiple cases that say if you have to take self-help measures, the school district shouldn't get credit for that. And so I do think, especially on the summary judgment posture, the record is replete with evidence that even after the no contact order was entered, again, there was this campaign of retaliation and the, you know, the school district just didn't do anything about that for about two months. I'll see you on rebuttal. Thank you. Okay. Let's hear then from Ms. Feeney. Thank you, Counsel. At this time, would Counsel for the Appellee please introduce herself on the record to begin? Good morning, Your Honor. I am Donna Feeney, and I represent SAU 8 and the Concord School District. I invite your questions at any time. The main premise here is whether the district court should have granted summary judgment. I believe that this court should affirm that finding. The case law here from this court is guided by Porto, which was decided first, and then Fitzgerald, which was decided very shortly after Porto. The deliberate indifference standard is a very high, very stringent bar, and we do not believe that the facts on the record below in any way suggest that the school district violated deliberate indifference. I would urge the court to look at the actual date chronology, something that has not been emphasized in the briefs or in the JA, but you need only look at a calendar to see what I mean. The assault on the bus takes place on November 29th, a Wednesday. It is reported to the school district on November 30th, a Thursday. The school district begins its investigation, the informal one, by interviewing the students on that Thursday. In that first statement made by ML, she gives an incomplete statement. It is not until the following Tuesday, just a couple of school days later, that the school district learns that ML has more to say, and a second statement is authored on December the 5th. Even that statement is not complete. It is not until December the 6th when ML and her mother are interviewed by Assistant Principal Davis, Shaley Davis, that the additional facts of digital penetration are provided to the school district. In the chronology and in the record, you will find that the district, on December the 5th, gave LM, the boy, a verbal no-contact warning. It is true it was not a written warning, but it was a verbal from the assistant principal. That was formalized on December the 11th when the report, the first report of the first formal investigation was issued. But as soon as that additional information was made available to the school district, just three or four school days after it was reported, the school district launched a formal sexual harassment investigation, issued a no-contact order to the boy, and provided assistance to ML in the form of additional counseling. And then, as you can see from the record, it goes on from there. The first report on December 11th did not conclude that there was anything other than an unwanted touching, and he was suspended from the bus for 10 days. The text messages to which my adversary refers were never produced to the school district until January of the following year, January 2018. And it was only when the parents complained about the findings of that December 11th, 2017 report, that the text messages were made available to the school district. So what you're saying by these examples is that as the school gets more information, the school takes more action. That is correct. You can't take that action based on, you know, day one of the complaint, or until the next week, or, you know, until things are provided to the school. That is correct. They cannot know what they have not been told. And if you look at that timeline chronology, as each piece of information is provided, they respond accordingly. When did they talk to the bus driver, interview the bus driver? They did not interview the bus driver. They looked at the bus driver's statement, which was provided to the district on December the 4th, the Monday. Okay, but there's a statement from her. That is correct. Yeah, they don't interview the bus driver. There's a decision made for a variety of reasons, judgment called by the district and investigators, that they did not need to interview the bus driver. But once they have their position, shouldn't the school continue to act properly once they had, because at least that initial statement from the bus driver is important. I would disagree, but I think it really would be the judgment of the school district as to how important that bus driver's written statement was so as to reach out to the bus driver. They did interview other students on the bus who could not corroborate the actions. They did so verbally and didn't take written statements initially. And then after the more compelling disclosure was made on December 5th and ultimately December 6th, and the formal sexual harassment investigation was launched, and the Deerfield police were notified, they then took written statements from two of the four that they re-interviewed on the bus. Let me ask you, who notified the Deerfield police? Was it the school or was it the parents? I'm sorry. I think it was the school, but I am not certain. We know that the school district was aware of the police department investigation because the SRO, the school resource officer, Hacipas, was present for the interviews of LM on the first and second time on December 5th and December 6th. So it may have been Officer Hacipas who informed the police department. I cannot say for certain. Counsel, your chronology was very helpful. You had taken us into January. You want to continue with it? Yes, Your Honor. In January, after the issuance of the December 11th, 2017 letter to LM's father, to LM telling him that he could not have contact, and to Mr. and Mrs. L, the plaintiff's parents, the plaintiff's parents were genuinely dissatisfied with the determination by the school district. And they sought and were given a meeting with the superintendent on January 24th or 25th of 2018. And when they met with the superintendent, they had a chronology of events that they felt had not been acted on. It's in the JA, and in that email that they sent to the superintendent, they went through a litany of events that they believed had not been focused on. The school district used that opportunity to then launch a reopened or second investigation, depending on how you're counting in the record. And they relaunched that, and it began immediately. They asked Assistant Principal Shaley Davis to conduct that investigation, and she did. She re-interviewed all of the students. She re-interviewed LM. She re-interviewed ML. And went through the chronology and produced an outline. And in the JA, you will see the outline of the first investigation, where the unwanted contact and violation of the order was found. And then you will find in the second investigation, the conclusion by letter in, I believe it was February of 2018, to the parents, formal letter March 2nd of 18, saying that the school district could not confirm the more egregious finding of the digital penetration on the bus. But they did find, after the parents provided them with the text messages in January of 2018, that there had been violations of the no contact order that had been issued. Either by texting with friends, or texting with friends by proxy in the hopes of having them influence ML. And those violations are what resulted in LM's having been suspended by the school district for four days. I would simply reiterate that it's a public school. They have an obligation, as Fitzgerald points out, that you have to treat both students fairly. It is a public school. They are both entitled to attend school. And I believe that the record supports that the district acted both expeditiously and completely when it went through this investigation from November 30th of 2017, when it was first informed, until March 2nd of 2018, when it issued that final letter. And an additional no contact that sort of went in perpetuity for LM. Let me ask you, regarding the video, during the initial investigation, it all tended to favor ML. And then there's a clear copy of the video, like a month or two months later, and that's where they conclude the video does not favor ML's position. It favors LM's position. Anything you want to comment about that video? Having probably the only one in the room who's seen the video and took depositions based on the video, what I can say to the court is the quality of the video was not supreme. But Shaley Davis and one of the other assistant principals, either Mr. Crumrine or Mr. Corkum, were able to view the better quality video. And it was them viewing the better quality video on, I believe, what was the bus company's laptop. The bus company was an independent third-party vendor. They viewed it there, and they were able to make some determinations. And the determinations that they made, and if you were to look at the video even in poor quality, what you can see is ML changing seats to move up closer to LM. And ML sits on one side of the bus. Because LM had moved up front, and then LM moved closer. There were a series, Your Honor, if you'll indulge me on it. What happens when the bus ride starts, ML sits on one side. LM sits on another side. ML moves up across and behind LM. They're not in the same seat yet. So she moves up once. She sits in the back. Then she moves up. She's across from LM in a seat behind. And then he moves over and sits in the seat with her. Then he moves up, and she's left in the seat by herself. She moves up and is now across the seat from him. And what the video would show is, I'm dating myself when I say play footsies, you see two legs sticking out in the aisle. Not somebody's backside or rear end as the bus driver says. You see two legs, hers from this side sticking in the aisle, and his from this side sticking in the aisle. And then he moves over to her seat. And that's when the disputed facts, if you would, that Shaley Davis believes that she sees actions of one leaning closer, the other leaning closer, ML pulling the neck from the head of LM down toward her. And when, excuse me, when Ms. Davis looks at this, it's her conclusion, rightly or wrongly, that she doesn't believe that the allegations that were articulated by ML are supported by that. But that's what the bus video supplies, the inconsistency of the changing of seats that originally ML never disclosed, that she was moving up closer to him. And that comes out in the second. That is correct. You mentioned there are disputed facts as to what happens in the bus, but my question is, do those disputed facts in any way affect the school's reasonable efforts? I do not think it does. They don't have to be flawless. The case law is very clear. They don't have to be flawless. They don't have to be perfect. They can be wrong. It's unfortunate that they can be wrong, but they don't have to be perfect. They have to take prompt, immediate action. They have to do the best they can and take the remedial steps that they believe in their judgment are the most appropriate. And in this case, LM had no prior history of any discipline, of any problem. And by all accounts from the interviews, LM and ML may have had a more than just be friends relationship. It was unclear. And only ML and LM, I made that hard for the case, know exactly what happened. They're the only two beings on the planet who know what happened. So the district does the best it can with the information it can in the serial fashion that it has obtained and provided to the district. Anything else? I have nothing further to add to the court. We'd ask that this court affirm the summary judgment of Judge Barbadaro. Thank you. Okay. Thank you. Rebuttal? Mr. Davey? Yes. I want to make three quick points on rebuttal. The first is that I think the chronology was instructive and that it underscored the circumstances of why this is similar to Willis, which is that the district learned in January about the violations of the no contact order and did nothing until March. I think it was about six weeks. That was a straightforward violation under Willis. A jury could find that that was clearly unreasonable under Willis. That's number one. The second is I want to talk about the second investigation because my colleague talked a lot about that. And the second investigation, actually, a jury could find that clearly unreasonable too. My colleague said at the end that they were the only two, but I do think it's worth talking about a bunch of the other things that came out in that investigation. One of them was that the second time around, Sholly Davis had LM having texted his girlfriend immediately after the assault saying that he had done something horrible and felt kind of sick and that he did something wrong to people and then was worried about losing them. That's at J261 to 262. SD, his girlfriend, texted another person saying that he'd gone too far, which in the context of teens means going beyond the consent that was allowed. Sholly Davis also had reports that he was manipulative, mean, possessive, sexist. That's J292 and 185. And she ignored a report that she received that he had previously sexually assaulted someone else, and that's at J198. They never talked to her counselor who would have said, if asked, that ML had been sexually assaulted. That's at J232. Who received the report that LM had sexually assaulted somebody else? That's Sholly Davis, the person who ultimately made the conclusion. And again, that's at J198 if you want to direct your attention there. And so if you take all of that into consideration, and she even wrote in her ultimate conclusion that she found LM himself noncredible. And so if you take all of that into your conclusion, what you're left with is sort of a case that's very similar to Fairfax and the Fourth Circuit where, again, as my colleague is inviting you to do, to infer consent from body language and from prior history, which, as the Fourth Circuit recently wrote, it's just not allowed under Title IX, and a jury could find that to be clearly unreasonable. Fairfax, for what it's worth, reversed a jury verdict in the other direction. And so on summary judgment, I think, you know, certainly a jury could look at similar facts and find in favor of ML. The last thing I'll say, we've spent a lot of time up here talking about facts, and I think everyone sort of agrees that all of these things are hotly disputed. And certainly, you know, obviously you're allowed to grant summary judgment under some circumstances, but where we've spent the whole time talking about these disputed facts and this question of the school's reasonableness, I do think that it's—and where the district court sort of construed some facts, including, again, the school district's initial—I'm sorry, I'll wrap up in a minute. Yeah, please wrap up. Yeah, where they construed the initial admission on the part of LM as, you know, oh, we don't know what to do about this. You know, the six-week delay after the no-contact order, they learned that it's been violated, they don't do anything. And ultimately the reinvestigation, which under Fitzgerald I think was clearly unreasonable, I think that there are several different bases upon which a reasonable jury could find that the school district had acted clearly unreasonably. And so for that reason, unless you have any further questions, I would urge you to— Any questions of Shelley or Judge Montecarlo? No, thank you. No, thank you. Okay, you're excused, and thank you both, counsel. Thank you, Your Honor. Okay, let's call the final case for argument this morning. Thank you, counsel. That ends argument in this case.